## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DOUGLAS A. HOGLAN,** | **)** | |
| Plaintiff, | **)** | Civil Action No. 7:16-cv-00595 |
| | **)** | |
| **v.** | **)** | |
| | **)** | By: Michael F. Urbanski |
| **A. DAVID ROBINSON, et al.,** | **)** | Chief United States District Judge |
| Defendants. | **)** | |

## MEMORANDUM OPINION

Douglas A. Hoglan, a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against various officials employed by the Virginia Department of Corrections ("VDOC"). After two rounds of summary judgment briefing, three claims remained to be tried. On December 12, 2019, Senior United States District Judge Jackson L. Kiser referred the remaining claims to a United States Magistrate Judge for further proceedings, including a bench trial. A bench trial was conducted on January 28 and 29, 2020, and on March 20, 2020, the magistrate judge issued a report and recommendation ("R&R") recommending that judgment be entered in favor of Hoglan on the remaining claims. Following the filing of objections, the case was transferred to another district judge, who referred the case for mediation, and the matter was stayed pending further order. On January 10, 2022, after the mediation proved unsuccessful, the case was transferred to the undersigned. Thereafter, the court lifted the stay and reinstated the case to the active docket.

This memorandum opinion addresses the parties' objections to the R&R and sets forth the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Having considered all of the evidence together with the applicable law, the court

concludes that the defendants are entitled to judgment on the remaining claims. Accordingly, the court sustains certain objections filed by the defendants and overrules Hoglan's objections. By separate order, the court will enter judgment in favor of the defendants.

## I.      Standard of Review

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court." Id.

When a dispositive matter is referred to a magistrate judge for consideration, the magistrate judge makes only a recommendation to the court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The R&R has no presumptive weight, and the responsibility to make a final determination remains with this court. Id. at 270–71. The court must conduct a de novo review of those portions of an R&R to which specific objections have been made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). Upon review, the court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); accord 28 U.S.C. § 636(b)(1)(C).

## II.      Background

At all times relevant to this action, Hoglan was incarcerated at Green Rock Correctional Center ("Green Rock") in Chatham, Virginia. On August 16, 2017, Hoglan filed an amended complaint against multiple VDOC and Green Rock officials, including A. David Robinson, Kim Crowder, Adina Pogue, James Bruce, Wayne Hudson, Holly Sims, Charles Crumpler, Karen Wilson, Bernard Booker, and Melvin Davis. See Am. Compl., ECF No. 30, at 1. In the

remaining claims before the court, Hoglan alleges (1) that the provision of VDOC Operating Procedure ("OP") 803.1 that treats all images received by email as personal images is unconstitutional; (2) that the defendants unlawfully prohibited him from receiving certain images from Sports Illustrated ("SI") and For Your Eyes Only ("FYEO") by email; and (3) that the defendants unlawfully prohibited him from receiving certain images from FYEO by mail. See R&R, ECF No. 207, at 1.

Hoglan filed suit against the defendants under 42 U.S.C. § 1983, asserting violations of the First Amendment. As relief for the alleged violations, Hoglan seeks (1) a judgment declaring that the defendants violated his constitutional rights; (2) an order enjoining the defendants from enforcing the challenged provision of OP 803.1; and (3) an award of compensatory damages, punitive damages, and costs. Am. Compl. at 28.

Following the bench trial, the magistrate judge issued an R&R in which he reached the following conclusions: (1) that the provision of OP 803.1 that treats all images received by email as personal images—and therefore prohibits inmates from receiving semi-nude commercial images by email—is unconstitutional under the test established in Turner v. Safely, 482 U.S. 78 (1987); (2) that the defendants violated the First Amendment by prohibiting Hoglan from receiving the specific images from SI and FYEO by email; (3) that the defendants violated the First Amendment by prohibiting Hoglan from receiving the specific images from FYEO by mail; and (4) that the defendants are not entitled to qualified immunity. R&R at 23–25. The magistrate judge recommended that judgment be entered in favor of Hoglan on the remaining claims, that the challenged policy provision be declared unconstitutional, and that

Hoglan be awarded $1.00 in nominal damages but no punitive damages. Id. at 25. Both sides timely filed objections to the R&R.

### III.   Testimony and Evidence

During the two-day bench trial, the parties presented testimony and documentary evidence. The witnesses consisted of Hoglan; defendants Charles Crumpler, Karen Aaron (née Wilson), Melvin Davis, Wayne Hudson, Bernard Booker, Holly Sims, Adina Pogue, Kim Crowder, James Bruce, and David Robinson; Michael Alvis; and Marcus Elam.[1] The magistrate judge's R&R provides a detailed account of the trial testimony, and the court will not fully repeat it here. Instead, the court will summarize the policy provisions and images at issue, as well as certain testimony related to the applicable policy provisions.

### A.   Applicable Policy Provisions

Inmates at Green Rock and other VDOC facilities are permitted to receive certain types of images by regular mail and by email. Emails are sent through an inmate email service provided by JPay, Inc., a private company that partners with correctional facilities to provide media and communication services.

Images received at VDOC facilities generally fall into two categories: personal images and commercial images. Personal images include pictures of family members and friends. Commercial images include pictures distributed by commercial vendors such as SI and FYEO.

Incoming images must comply with the requirements set forth in OP 803.1 (Offender Correspondence) and OP 803.2 (Incoming Publications). OP 803.1 contains a list of

---

[1] Marcus Elam was originally named as a defendant, but Hoglan voluntarily dismissed him from the case after he testified at trial.

"Offender Correspondence Restrictions and Prohibited Activities." OP 803.1(IV)(B), eff. Jan. 1, 2015, ECF No. 47-2. The list includes the following restrictions:

> a. Incoming offender correspondence from any source may not contain more than five photographs (personal or commercial).[2]

> b. Nude or semi-nude personal photographs or personal pictures (including pictures printed on standard weight printer paper) of any person are prohibited. Semi-nude shall include but is not limited to persons in diapers, underwear, lingerie, or swimwear.

OP 803.1(IV)(B)(9).

"Commercially distributed or personal photographs" are also prohibited if they meet the "Specific Criteria for Publication Disapproval" in OP 803.2. Id. The "Specific Criteria" requiring disapproval include:

> A.   Material that emphasizes explicit or graphic depictions or descriptions of sexual acts, including, but not limited to:

> > 1.   Actual sexual intercourse (vaginal, anal, or oral) including inanimate object penetration

> > 2.   Secretion or excretion of bodily fluids or substances in the context of sexual activity or arousal

> > 3.   Bondage, sadistic, masochistic, or other violent acts in the context of sexual activity or arousal

> > 4.   Any sexual acts in violation of state or federal law

> > 5.   Any manipulation of genitalia or buttocks

> . . . .

---

[2] A separate provision indicates that the five-photograph limit applies to emails. See OP 803.1(IV)(G)(5) ("All incoming [email] messages will be screened and must comply with the regulations governing written correspondence as provided in this operating procedure.").

I.     Material that contains nudity

OP 803.2(IV)(I), eff. Jan. 1, 2015, Pl.'s Trial Ex. 4, ECF No. 197-4. "Nudity" is defined as "[t]he showing (human or cartoon) of the male or female genitals, pubic area, female breast with less than a fully opaque covering of the areola, or male or female buttocks with less than a full opaque covering of the anus." OP 803.1(III).

OP 803.1 also contains provisions specifically applicable to email, which the operating procedure refers to as "secure messaging." OP 803.1(IV)(G). The particular provision at issue in this case (the "Email Policy"), which was added on May 4, 2016, states as follows:

> All pictures and photographs sent to offenders through secure messaging will be treated as personal and must comply with the requirements governing content established in this operating procedure for personal pictures and photographs to include prohibition of nude or semi-nude personal photographs or pictures of any person  Semi-nude shall include but is not limited to persons in diapers, underwear, lingerie, or swimwear.

OP 803.1(IV)(G)(3)(g).

All incoming images, whether sent by regular mail or by email, are screened by prison staff to ensure compliance with procedures before being delivered to the intended recipient. OP 803.1(IV)(B)(9) and (IV)(C). Likewise, all incoming and outgoing email messages are screened to ensure that they comply with applicable regulations. OP 803.1(IV)(G)(5). If prison staff members determine that a commercial photograph is disapproved for offender possession, they are required to notify the offender. OP 803.1(IV)(B)(9)(d)(ii).  Prison staff are also required to notify an offender if an email is returned to the sender for failing to comply with the requirements of OP 803.1. See OP 803.1(IV)(G)(3)(f)(i) ("Notification that the

message was censored and returned to the sender as well as the reason for the return will be provided electronically to the offender on their media device.").

B. **Testimony Regarding the Applicable Policies**

James Bruce was the Manager of the VDOC's Policy Initiatives Unit during the relevant period, and David Robinson was the Chief of Corrections Operation for the VDOC. Robinson testified that he was responsible for approving the provisions of OP 803.1, including the Email Policy that was added to the operating procedure in May 2016, which effectively prohibits semi-nude commercial images from being sent by email. Jan. 29, 2020 Trial Tr., ECF No. 205, at 105. Bruce testified that the Policy Initiatives Unit is responsible for formulating and editing operating procedures and that he personally worked on the amendment at issue. Id. at 71, 78.

Bruce and Robinson provided testimony regarding the VDOC's decision to provide offenders access to email. Bruce testified that the email system was established as "an effort to . . . provide more instantaneous communication between offenders and their families and friends," and that it was not intended to be used for commercial purposes or "any sending of questionable photographic materials." Id. at 78. Likewise, Robinson testified that the VDOC decided to offer the JPay email platform to offenders in order to provide an avenue for them to communicate with family members and friends quickly and easily for rehabilitative purposes. See, e.g., id. at 106–07 (explaining that the VDOC wanted to provide "a process that would allow for messaging between the offenders and the family to expediate as much as possible messaging to enhance the family reunification [process] for offenders"); see also OP 803.1(VIII)(A)(1) (eff. Oct. 1, 2017), Pl.'s Trial Ex. 1, ECF No. 197-1 ("Secure messaging is

provided for personal communications for individual offenders to maintain relationships in the community, only.").

When asked about the reasons for implementing the Email Policy, Bruce explained that VDOC officials had discovered that "offenders were using the system in ways that it wasn't intended" and that officials "found the need to document or to put in procedure more clearly what the expectations were." Jan. 29, 2020 Trial Tr. at 79. Along the same lines, Robinson testified that the VDOC wanted to "ensure that there would be a quicker review by staff" of the messages and images for which the email system was implemented and that the VDOC wanted to decrease the amount of time that prison staff members were having to review other types of emailed images. Id. at 107–08; see also id. at 110 (noting that the VDOC intended for inmates to be able to receive personal images from friends and family through the email system).

Robinson also testified that "there was a concern related to the amount of work that [the VDOC's] institutional staff had to do" in screening images sent by email. Id. at 112. He explained that if the VDOC were to alter the Email Policy and allow offenders to receive semi-nude commercial images by email, such changes would result in an "[i]ncreased number of [emails] coming into the facilities that would have to be scrutinized in regard[] to their content" and that the increased volume of messages and images would "slow down or hinder [offenders] having access to regular secure messages with attachments." Id. at 143.

Consistent with Robinson's testimony, officials at Green Rock testified that the facility was already having a difficult time keeping up with the influx of personal images sent through the JPay system. For instance, Charles Crumpler testified that Green Rock's mailroom staff is

8

already "stretched" thin and that the mailroom does not have enough "man-hours" to handle the "volume of digital images," while also being responsible for handling and screening physical mail. Jan. 28, 2020 Trial Tr., ECF No. 204, at 79–80. Consequently, Green Rock has "three people working in the Intel office, two officers and an investigator," who are responsible for reviewing images sent by email. Id. at 178. Intelligence Officer Michael Alvis testified that his office had just received 554 digital images to review from a single weekend, over 60 of which contained nude material, and that he and his coworkers collectively spend six to eight hours each day reviewing emails and digital images, in addition to their other duties. Id. at 189–90. Alvis attributed the volume of emails and digital images to cost, explaining that "it's less expensive to send a message on JPay than it is through regular mail to a prisoner." Id. at 199; see also id. at 192 ("[Y]ou can buy 40 [stamps on JPay] for 9.95, so it's really like 25 cents a piece. So it's advantageous to use the JPay system."). Additionally, Warden Melvin Davis testified that he already has to help review digital images "if Intel is behind" and that permitting inmates to receive semi-nude commercial images by email "would require [the prison] to add at least one more full-time equivalent position in the Intel [office] because it would overwhelm that system." Jan. 29, 2020 Trial Tr. at 169. Davis further testified that employing another individual to screen images would cost approximately $45,000 to $50,000 per year at Green Rock alone. Id. at 181. Davis also emphasized that the email system was implemented to allow inmates to keep in touch with family members and friends, and that "adding commercial photographs to that system . . . would slow down how people get the personal correspondence." Id. at 169.

In addition to addressing the Email Policy, David Robinson explained "why [the VDOC] has in place policies and procedures that restrict . . . sexually charged images for offender possession." Id. at 138. Robinson testified that the possession of "sexually charged images" creates "a potential for [sexual] harassment by offenders" and can be "counterproductive to rehabilitation of individuals in [the VDOC] system that are going through programming due to the type of crime they have." Id.; see also id. at 141. For instance, Robinson noted that there are offenders in the VDOC who are subject to sex offender treatment and that possessing "sexually charged images" would be "counterproductive to their treatment program." Id. at 139. Additionally, Robinson testified that the VDOC has received complaints from correctional officers and mailroom staff "about having to review sexually charged images" sent to offenders. Id. at 141.

## C.    Evidence Related to the Denial of Specific Images

On March 19, 2016, Hoglan's mother emailed him three images from the 2016 SI Swimsuit Issue. Hoglan introduced copies of the images as exhibits. One image shows a woman, in a string bikini, on her hands and knees with her breasts partially exposed. See Pl.'s Trial Ex. 6, ECF No. 197-6.  The second image is of a woman, in a bikini, kneeling in the sand. Id. The third image is of a topless woman with her hands partially covering her breasts. Id. Green Rock staff members denied Hoglan access to the semi-nude digital images. Hoglan testified that he subsequently received printed versions of the same images through the regular mail "without issue." Jan. 29, 2020 Trial Tr. at 11.

On June 6, 2016, Hoglan was notified that he had received an email containing images from FYEO, a commercial photo distributor, and that the images were not being forwarded

10

to him due to their content. <u>See</u> Pl.'s Trial Ex. 9, ECF No. 197-9. One image shows the backsides of three women with their underwear partially pulled down; the second image is of a woman kneeling on a bed, wearing a tank top and underwear; and a third image shows four women on their hands and knees, facing the camera, with their exposed buttocks in the air. <u>Id.</u> It is undisputed that the emailed images were denied on the basis that they contain semi-nudity and that Hoglan subsequently received printed versions of the same images by regular mail.

In October 2016, Hoglan received three images from FYEO by regular mail. <u>See</u> Pl.'s Trial Ex. 3, ECF No. 197-3. One image is of a woman, wearing a bra and underwear, lying on her back and kissing another woman wearing a bra and underwear, while a third woman is beginning to remove the underwear of the woman lying down. <u>Id.</u> The second image shows the top halves of three topless women who are facing each other and open-mouth kissing. <u>Id.</u> The third image is of four women, one of whom is topless with her backside to the camera. <u>Id.</u> The other three women are pulling down her underwear with their teeth and hands, and her buttocks are exposed. <u>Id.</u> On October 25, 2016, the mailroom supervisor issued notices advising that the images had been denied on the basis that they contain "material that emphasizes explicit or graphic depictions or descriptions of sexual acts," in violation of OP 803.2. <u>Id.</u> Approximately three to six months later, Hoglan ordered the same images from FYEO again, and he was allowed to possess them. <u>See</u> Jan. 29, 2018 Tr. at 55.

## IV.   Findings of Fact

Based on the testimony and evidence presented at trial, the court makes the following findings of fact:

1.      Hoglan is in the custody of the VDOC. He was housed at Green Rock, a VDOC facility, in 2016, when the incidents at issue occurred.

2.      Inmates at Green Rock and other VDOC facilities have access to an email system provided by JPay.

3.      VDOC officials implemented the email system in order for inmates to efficiently communicate with family members and friends and maintain relationships in the community. Emails can be sent at more affordable rates than regular postage.

4.      Inmates at Green Rock and other VDOC facilities are permitted to receive certain types of images by mail and by email.

5.      Incoming offender correspondence from any source may not contain more than five photographs. There is no limit on the number of messages that may be sent by email.

6.      All incoming images, whether sent by regular mail or by email, are screened by prison staff to ensure compliance with procedures before being delivered to the intended recipient.

7.      Inmates at Green Rock and other VDOC facilities are not permitted to receive images that contain nudity. Nudity is defined as the "showing (human or cartoon) of the male or female genitals, pubic area, female breast with less than fully opaque covering of the areola, or male or female buttocks with less than a full opaque covering of the anus."

8.      Inmates at Green Rock and other VDOC facilities are not permitted to receive images that violate the Specific Criteria for Publication Disapproval in OP 803.2. Among other restrictions, inmates may not receive images that "emphasize explicit or graphic depictions or descriptions of sexual acts, including, but not limited to": "[a]ctual sexual intercourse (vaginal,

anal, or oral)" and "[s]ecretion or excretion of bodily fluids or substances in the context of sexual activity or arousal."

9.     Inmates at Green Rock and other VDOC facilities are not permitted to receive personal images that contain semi-nudity. Semi-nudity is defined to include persons in diapers, underwear, lingerie, or swimsuits.

10.     During the relevant period, inmates at Green Rock and other VDOC facilities were permitted to receive commercial images that contained semi-nudity.

11.     On March 19, 2016, Hoglan's mother emailed him three images from the 2016 SI Swimsuit Issue that were denied because they contained semi-nudity. Hoglan subsequently received the same SI images by mail, and he was allowed to possess them.

12.     On May 4, 2016, OP 803.1 was amended to state that all images received through the JPay email system would be treated as personal images for screening purposes. As a result, inmates are not permitted to receive semi-nude commercial images by email. However, they are still permitted to receive semi-nude commercial images by mail.

13.     On June 6, 2016, Hoglan was notified that he had received an email containing three images from FYEO, a commercial photo distributor, which were denied because they contained semi-nudity. Hoglan subsequently received the same images by mail, and he was allowed to possess them.

14.     In October 2016, Hoglan ordered three additional images from FYEO by mail. The mailroom staff denied access to the images on the basis that they contained material that "emphasize[d] explicit or graphic depictions or descriptions of sexual acts." Several months later, Hoglan ordered the same images again, and they were approved for his possession.

## V.      Conclusions of Law

### A.      The Validity of the Challenged Email Policy

The court will first address Hoglan's facial challenge to the provision of OP 803.1 that effectively prohibits inmates from receiving semi-nude commercial images by email. Hoglan claims that the Email Policy violates inmates' rights under the First Amendment. After considering the factors set forth in Turner v. Safley, 482 U.S. 78 (1987), the magistrate judge determined that the Email Policy is not "reasonably related to a legitimate penological interest and, thus, . . . that the policy is invalid." R&R at 23. The defendants have objected to the magistrate judge's application of the Turner test. After careful consideration of the record and applicable law, the court will sustain the defendants' objections and uphold the Email Policy.

### 1.      The Turner Test

"The First Amendment, as incorporated through the Fourteenth Amendment, prohibits states from 'abridging the freedom of speech.'" Haze v. Harrison, 961 F.3d 654, 658 (4th Cir. 2020) (quoting U.S. Const. amend. I). The Supreme Court has recognized that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment." Beard v. Banks, 548 U.S. 521, 528 (2006). Instead, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objections of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974).

The Supreme Court has also recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of

government." Turner, 482 U.S. at 84–85; see also Procunier v. Martinez, 416 U.S. 396, 405 (1974) (noting that "courts are ill equipped to deal with the increasingly urgent problems of prison administration"). Additionally, because prison administration is a task that has been committed to the legislative and executive branches, "separation of powers concerns counsel a policy of judicial restraint" and deference to decisions made by prison officials. Turner, 482 U.S. at 85. In cases involving a state penal system, "federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Id. Accordingly, even if a prison's policy or practice impinges on inmates' constitutional rights, it remains "valid if it is reasonably related to legitimate penological interests." Id. at 89.

In Turner, the Supreme Court identified four factors that courts may consider in assessing the validity of a prison policy or regulation that impinges upon constitutional rights. Turner, 482 U.S. at 89–91. The Fourth Circuit has articulated those factors as follows:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . . ; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006) (first and third alterations in original) (quoting Turner, 482 at 89–92).

When applying the Turner factors, the court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for

defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Additionally, the Supreme Court has made clear that the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Id. Thus, Hoglan "has the burden to show that the [policy] at issue [is] not 'reasonably related to legitimate penological interests.'" Wright v. Lassiter, 921 F.3d 413, 418 (4th Cir. 2019) (quoting Jehovah v. Clarke, 798 F.3d 169, 176 (4th Cir. 2015)); see also Desper v. Clarke, 1 F.4th 236, 245 (4th Cir. 2021) ("As an inmate challenging the constitutionality of a prison regulation or action under that regulation, Desper carries the burden to 'disprove' its validity.") (quoting Overton, 539 U.S. at 132); Heyer, 984 F.3d at 356 ("Heyer bears the burden of establishing that the BOP's ban on point-to-point calls is unreasonable, and 'substantial deference' must be given to the judgments of BOP staff.") (quoting Overton, 539 U.S. at 132).

### 2.   Application of the Turner factors

The magistrate judge concluded that the first, third, and fourth Turner factors weigh in favor of Hoglan. After reviewing the entire record and applicable case law, the court disagrees. Because all four factors weigh in favor of the VDOC, the court concludes that Hoglan has not met his burden of establishing that the Email Policy violates the First Amendment.

### a.   First Factor

The first Turner factor asks whether there is a rational connection between the Email Policy and the VDOC's legitimate penological interests, "or if that connection is instead 'so remote as to render the policy arbitrary or irrational.'" Heyer, 984 F.3d at 357 (quoting Turner,

482 U.S. at 89–90). Importantly, "[a] logical connection, even in 'the most general sense,' will suffice." Id. (quoting Jehovah v. Clarke, 798 F.3d at 178). The appropriate inquiry is not whether the Email Policy "in fact advances" the VDOC's legitimate penological interests but whether the VDOC "might reasonably have thought that it would." Sisney v. Kaemingk, 15 F.4th 1181, 1191 (8th Cir. 2021) (quoting Amatel v. Reno, 156 F.3d 192, 198 (D.C. Cir. 1998)).

At trial, the defendants identified several penological interests in support of the Email Policy, including saving prison resources, rehabilitating offenders, preserving staff morale, and protecting staff members and other inmates from sexual harassment. Courts have held that each of these interests is legitimate in the context of First Amendment challenges to prison regulations. See, e.g., Pell, 417 U.S. at 823 (emphasizing that inmate rehabilitation is a "paramount objective of the corrections system"); Reynolds v. Quiros, 25 F.4th 72, 85 (2d Cir. 2022) (recognizing that rehabilitating inmates and promoting a non-hostile work environment for corrections staff are legitimate penological interests); Simpson v. Cnty. of Cape Girardeau, 879 F.3d 273, 279 (8th Cir. 2018) (observing that institutional efficiency is a legitimate penological objective); Jackson v. Frank, 509 F.3d 389, 391 (7th Cir. 2007) (concluding that "the defendants' economic interest in saving staff resources is legitimate"); Lindell v. Frank, 377 F.3d 655, 659 (7th Cir. 2004) (same). Thus, the court must determine whether the Email Policy is rationally related to any of the legitimate penological interests asserted by the defendants. See Aref v. Lynch, 833 F.3d 242, 260 (D.C. Cir. 2016) (explaining that the first Turner factor "asks whether the prison's actions bear a rational connection to any legitimate penological interest"); see also Reynolds, 25 F.4th at. 91 (emphasizing that, "even in the absence of the DOC's hotly-debated rehabilitation justification, the other legitimate

penological interests asserted by DOC . . . each independently support the constitutionality of the [policy] under this [first] component of the <u>Turner</u> test").

In the R&R, the magistrate judge focused solely on two of the interests identified by the defendants, noting that the defendants "argue that treating all emailed images as personal images, i.e. not allowing semi-nude images by email, protects staff and other inmates from sexual harassment and assault, and improves staff morale by not subjecting them to having to screen the images." R&R at 21–22. The magistrate judge then concluded that the defendants had not established a rational connection between those particular interests and the Email Policy, reasoning as follows:

> A glaring deficiency in defendants' argument is that VDOC policy allows inmates to receive these very same images by mail. Defendants have presented no evidence that inmates are more likely to sexually harass or assault others if they receive semi-nude images by email versus mail. Nor have they presented evidence that staff morale is affected by whether the images are received by email or mail. Moreover, during a search of a prisoner's cell, staff would likely review a prisoner's paper images stored with his belongings, but not any digital images saved on a JPay device. Accordingly, I conclude that defendants have not established a valid, rational connection between the regulation and the interests they assert.

R&R at 22.

Having reviewed the record and applicable case law, the court declines to adopt the magistrate judge's conclusion for several reasons. First, the foregoing analysis does not fully or accurately reflect the asserted justifications for the Email Policy. The defendants did not argue that viewing digital semi-nude images affects staff morale more than viewing printed semi-nude images, or that inmates who possess digital semi-nude images are more likely to harass staff members than inmates who possess printed semi-nude images. Instead, the

18

defendants presented evidence indicating that use of the email system to receive semi-nude commercial photographs would likely increase if offenders were permitted to utilize the system for that purpose, and the defendants argued that the increased volume of semi-nude commercial images that require screening would negatively impact prison resources, staff morale, and the speed at which offenders receive messages from family and friends over email. See, e.g., Jan. 29, 2020 Trial Tr. at 176 (asserting that "add[ing] more images on top of what is already coming in is going to be a burden on staff"); id. at 178 –79 (emphasizing that the increased volume of images is a "major concern" and that "the Department's fear is that there would be an increase in the number of users trying to send in commercial photographs of semi-nude individuals by the JPay system").

Second, prison officials need not "present evidence that the censored materials have ever actually caused any disruption at the [prison]." Murchison v. Rogers, 779 F.3d 882, 890 (8th Cir. 2015) (emphasis in original). Instead, "prison officials may also seek to prevent harm that has yet to occur." Id. "Moreover, Turner does not require actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational." Simpson, 879 F.3d at 279 (internal quotation marks and citation omitted); see also Prison Legal News v. Ryan, 39 F.4th 1121, 1132 (9th Cir. 2022) ("The rational-relationship inquiry is highly deferential . . . . [A] court may uphold a regulation even if prison officials are unable to prove that the banned material actually caused problems in the past, or that the materials are likely to cause problems in the future. Nor must the officials be able to demonstrate that the policy in fact advances the jail's interests. Rather, it is enough that officials might reasonably have thought that the policy would do so.") (internal quotation

marks and citations omitted); <u>Prison Legal News v. Sec'y, Fla. Dep't of Corr.</u>, 890 F.3d 954, 968 (11th Cir. 2018) ("We have rejected the misconception that prison officials are required to adduce specific evidence of a causal link between [a prison policy] and actual incidents of violence (or some other actual threat to security). Requiring proof of such a correlation constitutes insufficient deference to the judgment of the prison authorities with respect to security needs. Other circuits agree.") (alteration in original) (internal quotation marks and citations omitted).

Third, the relationship between the Email Policy and the asserted objectives is not "so remote as to render the policy arbitrary or irrational." <u>Turner</u>, 482 U.S. at 89–90. Based on the evidence presented, the court has no difficulty concluding that the Email Policy is rationally related to legitimate penological objectives, including the VDOC's interests in preserving staff resources and providing a platform for offenders to efficiently communicate with family and friends for rehabilitative purposes. This conclusion is consistent with other cases in which courts have recognized that mail policies enacted for similar reasons satisfy the first <u>Turner</u> factor and its highly deferential inquiry. <u>See, e.g.</u>, <u>Jackson v. Frank</u>, 509 F.3d at 391 (holding that a rational connection exists between a policy that prohibits inmates from possessing individual commercial photographs of celebrities and models and the defendants' legitimate interest in saving staff resources); <u>Lindell v. Frank</u>, 377 F.3d at 659 (concluding that defendants' interests in screening for hidden messages and saving staff resources are both legitimate and that "there is a rational connection between these interests and a policy that lowers the overall number of mailed items that require screening").

### b.      Second Factor

The second <u>Turner</u> factor asks whether prison inmates have "alternative means of exercising" their First Amendment rights. <u>Turner</u>, 482 U.S. at 90. The magistrate judge correctly concluded that this factor clearly favors the defendants since inmates "can receive the exact same [commercial] images by mail." R&R at 22; <u>see also</u> <u>Sebolt v. Samuels</u>, 749 F. App'x 458, 460 (7th Cir. 2018) (noting that the second factor justified dismissal of an action challenging a prisoner's denial of access to publications through email since the prisoner could "use the regular mail to obtain similar periodicals").

### c.      Third Factor

The "third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." <u>Turner</u>, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." <u>Id.</u>

In addressing this factor, the magistrate judge acknowledged the defendants' argument that "allowing inmates to receive semi-nude images by email will increase the number of images that need to be screened because it is cheaper to send an image by email than by mail, and that the increase in volume will require additional staff." R&R at 22. However, the magistrate judge found the argument unpersuasive in light of testimony that he believed suggested that digital images can be screened by staff members in a "relatively efficient" manner. <u>Id.</u> The magistrate judge also noted that "any anticipated concerns about the volume of images sent by email could be curtailed by imposing a limit on the number of images

permitted to be received and/or retained, regardless of their content, which is similar to VDOC policy that imposes a five-photograph limit on images received through the mail." Id.

Having reviewed the record, the court declines to adopt the magistrate judge's reasoning and analysis for three reasons. First, the R&R fails to adequately address the trial testimony indicating that prison officials would have to allocate more time, personnel, and money to reviewing digital images if inmates are permitted to receive semi-nude commercial images over email. As indicated above, Charles Crumpler testified that Green Rock's mailroom staff is already overextended and that the mailroom does have enough "man-hours" to handle the "volume of digital images," while also being responsible to handle and screen physical mail. Jan. 28, 2020 Trial Tr. at 79–80. Consequently, Green Rock has "three people working in the Intel office, two officers and an investigator," who are responsible for reviewing images sent by email. Id. at 178. Intelligence Officer Michael Alvis testified that his office had just received over 500 digital images to review from a single weekend and that he and his coworkers collectively spend six to eight hours each day reviewing emails and digital images, in addition to their other responsibilities. Id. at 189–90. Additionally, Warden Melvin Davis testified that the volume of digital images to be screened sometimes requires his assistance and that permitting inmates to receive semi-nude commercial images by email "would require [the prison] to add at least one more full-time equivalent position in the Intel [office] because it would overwhelm that system." Id. Davis further testified that employing another individual to screen images would cost up to $50,000 per year at Green Rock alone. Thus, even if the process for reviewing a digital image could be accurately characterized as "relatively efficient," allowing inmates to obtain semi-nude images by email, thereby increasing the volume of digital

images that need to be screened, would obviously impact prison resources. When presented with similar evidence and arguments, courts have held that the third factor favors prison officials. See, e.g., Simpson, 879 F.3d at 281 ("Requiring Cape Girardeau to abandon the postcard-only policy would force the jail to dedicate more time and resources to searching the mail, which would detract from the officers' other duties related to security and inmate welfare."); Jackson, 509 F.3d at 392 ("The third factor, the impact of accommodating the right on prison resources, also cuts in the defendants' favor. The defendants receive up to 1,500 pieces of mail per day and, they assert, the ban on individual, commercially published photographs is necessary to preserve staff resources. We agree.").

Second, the R&R does not consider the impact that Hoglan's preferred method of receiving commercial semi-nude images would have on "other inmates." Turner, 482 U.S. at 90. Prison officials testified that the email system was implemented in order to facilitate "personal communication between offenders and family and friends" and "provide more instantaneous communication between offenders and their family and friends." Jan. 29, 2020 Trial Tr. at 78; see also Jan. 28, 2020 Trial Tr. at 169 ("[The email] system was created and the policy speaks to the fact that it was created for personal correspondence for people to stay in touch with their families and to create—recreate or keep these social bonds that they had before they go home."). The defendants also offered testimony regarding the impact that expanding the email system to permit the transmission of semi-nude commercial images would have on other inmates waiting to receive emails from friends and family. Warden Davis testified that allowing inmates to receive commercial semi-nude images over JPay would increase the volume of email communications that require screening and therefore lengthen

the time it takes for offenders to receive the type of personal correspondence that the email system was designed to facilitate. Jan. 28, 2020 Trial Tr. at 169.

Third, the evidence adduced at trial indicates that the alternative limitation proposed by the magistrate judge–a five-photograph limit on images received by email—has already been implemented by the VDOC. OP 803.1 provides that "[i]ncoming offender correspondence from any source may not contain more than five photographs" and that messages sent by JPay "must comply with the regulations governing written correspondence." Consistent with these provisions, Michael Alvis testified that each email sent through JPay can have no more than five photographs attached to it. Tr., ECF No. 204, at 200–01; see also id. at 192 ("[Emails] can have a maximum of five similar to what the mailroom can have. It's five pictures."). However, there is no limit on the number of messages that an inmate may receive through JPay. Id. at 200–01; see also id. at 201 (explaining that "you might be able to have ten messages with five photos attached to each message for an offender, and that would be a total of 50 images that would come in [for] one offender"). Thus, applying the existing five-photograph limit to the number of commercial semi-nude images sent by email would not adequately alleviate the defendants' concerns regarding the volume of images that would potentially need to be screened by prison officials if inmates were allowed to utilize JPay for this purpose. Consequently, the court concludes from the evidence at trial that the third factor favors the defendants.

### d.   Fourth Factor

The final Turner factor requires the court to consider whether the Email Policy is "an exaggerated response to prison concerns." Turner, 482 U.S. at 90. "The burden is on the

[inmate] challenging the regulation . . . to show that there are obvious, easy alternatives to the regulation that would fully accommodate the inmate's rights at a de minimis cost to valid penological interests." Prison Legal News, 39 F.4th at 1135 (internal quotation marks and citation omitted). Moreover, the Supreme Court has made clear that "Turner does not require the [VDOC] to use the 'least-restrictive-alternative' means of achieving its goals." Id. (quoting Overton, 539 U.S. at 136).

Here, Hoglan has not identified any alternatives to the Email Policy that would meet the "high standard" set forth above. Overton, 539 U.S. at 136. Although the R&R suggests that limiting the number of images would be an "easy alternative to prohibiting the semi-nude pictures by email," R&R at 23, the record reflects that such limitation has already been implemented by the VDOC. And because there is no restriction on the number of emails that may be sent over the JPay system, merely limiting the number of semi-nude commercial photographs that may be attached to each email would not fully alleviate the defendants' volume-related concerns. Additionally, to the extent that the R&R could be read to suggest that prison officials could reduce the volume of digital images that require screening by limiting the number of emails that may be sent to an inmate, there is no evidence from which the court could find that such limitation is feasible through JPay or that it would "fully" accommodate Hoglan's First Amendment rights at a "de minimis cost to valid penological interests."[3] Turner, 482 U.S. at 91; see also Jackson, 509 F.3d at 392 (concluding that the fourth Turner

---

[3] To the contrary, David Robinson testified that limiting the number of emails that an offender may receive would "create other problems in the Department of Corrections." Jan. 29, 2020 Trial Tr. at 144. For instance, Robinson testified that it would place an "administrative burden" on staff members who may be responsible for tracking the number of messages and providing notice to senders and recipients that messages have been rejected. Id. at 145.

factor favored the defendants since the plaintiff "put forward no evidence of the supposed cost savings of capping the volume of mail that inmates may receive compared to the benefits of banning individual, commercial photographs," and emphasizing that "the defendants' decision to eliminate only one segment of mail is consistent with their stated goal of saving staff resources"). Thus, like the first three factors, the final factor favors the defendants.

For these reasons, Hoglan has not met his burden of establishing that the Email Policy is "not reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Because all four Turner factors favor the defendants, the court concludes that the policy does not violate the First Amendment.[4]

## B.    The Decision to Deny Access to Certain Images

The magistrate judge also concluded that "the defendants' decision to deny the specific six semi-nude images by email" violated Hoglan's First Amendment rights, as did the "decision to deny Hoglan the specific three mailed FYEO images." R&R at 23–24. Since the VDOC allows inmates to receive semi-nude images by mail, the magistrate judge determined that the decision to deny access to the same images by email was an "exaggerated response" to the penological concerns articulated by the defendants. Id. at 23. Likewise, because "Hoglan was able to receive the exact same [FYEO] images when he requested them by mail the second . . . time three to six months later, [the magistrate judge concluded] that the [initial] decision to deny these images was an 'exaggerated response to prison concerns' and, thus, was not reasonably related to a legitimate a penological interest." Id. Accordingly, the magistrate judge

---

[4] Additionally, for the same reasons set forth below, the defendants did not violate clearly established law in implementing or enforcing the Email Policy. Thus, they are also entitled to qualified immunity.

concluded "that the defendants violated Hoglan's First Amendment rights when they denied him the images at issue," and he recommended that the court award nominal damages in the amount of $1.00. Id. To the extent that the defendants argued that they are entitled to qualified immunity, the magistrate judge "reject[ed] this assertion," reasoning that "it was clearly established that defendants were constrained to comply with the First Amendment when offering a 'privilege' to inmates." Id. at 23 n.7.

The defendants object to the magistrate judge's conclusions on several grounds. They contend, among other arguments, that the R&R's analysis of qualified immunity "does not narrowly define the constitutional right at issue and does not consider whether any such right was clearly defined." Defs.' Objs. at 33. For the reasons set forth below, the court sustains the defendants' objections in this regard and concludes that they are entitled to qualified immunity.

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[5] Id.

---

[5] Qualified immunity applies to claims for monetary relief against officials in their individual capacities, but is not a defense against claims for declaratory or injunctive relief. Wall v. Wade, 741 F.3d 492, 498 n.9 (4th Cir. 2014). Having determined that the challenged Email Policy is valid under Turner, Hoglan is not entitled to the requested injunction prohibiting prison officials from enforcing the policy. To the extent that Hoglan also seeks a judgment declaring that the defendants violated his constitutional rights by denying access to the specific images, he is not entitled to such relief. See Bayer v. Neiman Marcus Grp., 861 F.3d 853, 868 (9th Cir. 2017) ("[A] declaratory judgment merely adjudicating past violations of federal law . . . is not an appropriate exercise of federal jurisdiction.") (citing Green v. Mansour, 474 U.S. 64, 74 (1985)); Corliss v. O'Brien, 200 F. App'x 80, 84 (3d Cir. 2006) ("Declaratory judgment is inappropriate solely to adjudicate past conduct. Nor is declaratory judgment meant simply to proclaim that one party is liable to another.").

(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Thus, government officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (emphasis added) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). Because the second prong of the analysis is dispositive here, the court will proceed directly to the inquiry of whether denying the photographs at issue violated a clearly established right. See Pearson, 555 U.S. at 239 (noting that addressing the second prong first is especially appropriate in cases where "a court will rather quickly and easily decide that there was no violation of clearly established law"); see also Knibbs v. Momphard, 30 F.4th 200, 223 (4th Cir. 2022) (noting that "in this Circuit, a defendant-officer bears the burden to prove that a right was not clearly established") (citing Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022)).

The Supreme Court has explained that a constitutional right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). Although a previous case directly on point is not required, "existing precedent must have placed the constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" Wesby, 138 S. Ct. at 599 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

When deciding whether a right was clearly established, courts typically ask whether, at the time of the alleged violation, "there existed either controlling authority . . . or a robust consensus of persuasive authority that would have given the defendants fair warning that their

conduct was wrongful." <u>Turner v. Thomas</u>, 930 F.3d 640, 644 (4th Cir. 2019) (internal

quotation marks and citations omitted). "It is not enough that the rule is suggested by then-

existing precedent." <u>Wesby</u>, 138 S. Ct. at 590. Instead, "[t]he precedent must be clear enough

that every reasonable official would interpret it to establish the particular rule the plaintiff

seeks to apply." <u>Id.</u> "Otherwise, the rule is not one that 'every reasonable official' would

know." <u>Id.</u> (quoting <u>Reichle</u>, 566 U.S. at 664).

Additionally, the Supreme Court has "repeatedly told courts . . . not to define clearly

established law at a high level of generality." <u>al-Kidd</u>, 563 U.S. at 742. Instead, courts must

determine "whether the violative nature of <u>particular conduct</u> is clearly established." <u>Id.</u>

(emphasis added). "This inquiry 'must be undertaken in light of the specific context of the

case, not as a broad general proposition.'" <u>Rivas-Villegas v. Cortesluna</u>, 142 S. Ct. 4, 8 (2021)

(<u>per</u> <u>curiam</u>) (quoting <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (<u>per</u> <u>curiam</u>)). Thus, the

court must determine whether then-existing precedent would have put a reasonable prison

official on notice that denying access to the specific types of images at issue would violate an

inmate's First Amendment rights.

### 1.     The Emailed Images from SI and FYEO

The court will first consider the decision to deny access to the emailed images from SI

and FYEO. All six images were denied on the basis that they contained semi-nudity. The SI

images were denied in March 2016, several weeks before the VDOC officially amended OP

803.1 to effectively prohibit inmates from receiving semi-nude images by email. The FYEO

images were denied in June 2016, after the Email Policy took effect. OP 803.1 does not

prohibit inmates from receiving semi-nude commercial images by regular mail, and it is undisputed that Hoglan was permitted to receive the same images in that manner.

The court agrees with the defendants that they did not violate clearly established federal law "when they denied these images by email." R&R at 24. As the defendants emphasize in their objections, "[t]here appears to be absolutely no case law—much less case law in the Fourth Circuit—which even suggests that an inmate has a First Amendment right to receive semi-nude commercial images over a prison's email platform." Defs.' Objs., ECF No. 221, at 35. To the contrary, at the time of the challenged decisions, several district courts had recognized that prisons could lawfully deny access to email altogether. See, e.g., Edington v. Warden of Fed. Corr. Inst. Elkton, No. 4:14-cv-2397, 2015 U.S. Dist. LEXIS 52804, at *7 (N.D. Ohio Apr. 22, 2015) ("While prisoners have a First Amendment right to communicate with the outside world, they do not have a constitutional right to a particular form of communication, such as access to email.") (collecting cases). The same is true today. See Bethel v. Warden Chillicothe Corr. Inst., No. 2:20-cv-5725, 2022 U.S. Dist. LEXIS 50559, at *6 (S.D. Ohio Mar. 22, 2022) (noting that inmates "do not have a constitutional right to access email" and that the defendants did not violate the plaintiff's constitutional rights by simply censoring certain emails) (citations omitted); Edwards v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:19-cv-0254, 2019 U.S. Dist. LEXIS 74718, at *10 (N.D.N.Y. May 3, 2019) ("Although prison inmates retain a right under the First Amendment to send and receive information while incarcerated, they do not have a constitutional right to a particular form of communication, including access to the internet or email.") (citations omitted); see also Sebolt, 749 F. App'x at 460 ("[An inmate] does not have an unrestricted First . . . Amendment right

to receive publications . . . by electronic mail."). As another district court recently noted, "the federal courts have not [yet] determined that the 'right' to email communication is as broad as the 'right' to receive mail." <u>Miles v. Scanlon</u>, No. 1:21-cv-00074, 2021 U.S. Dist. LEXIS 86556, at *12 (W.D. Mich. May 6, 2021).

Moreover, existing precedent did not provide fair warning that permitting semi-nude images to be received by regular mail, but not email, would pose a constitutional problem. To the contrary, the existence of alternative means for inmates to exercise asserted constitutional rights weighs in favor of upholding a correctional policy or decision. <u>See</u> <u>Turner</u>, 482 U.S. at 90 ("Where other avenues remain available for the exercise of the asserted right, the courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation."); <u>see also</u> <u>Jackson</u>, 509 F.3d at 392 (concluding that the fact that inmates could subscribe to magazines containing celebrity photographs weighed in favor of upholding a ban on individual commercial photographs of celebrities); <u>Rogers v. Martin</u>, 84 F. App'x 577, 578 (6th Cir. 2003) (noting, in upholding a prison mail policy, that "prisoners had alternative means of acquiring sexually explicit materials such as written descriptions of sex acts"); <u>Chatman v. Clarke</u>, No. 7:16-cv-00509, 2016 U.S. Dist. LEXIS 180131, at *6 (W.D. Va. Dec. 29, 2016) (summarily dismissing a state inmate's complaint alleging that excluding him from access to email in prison violated his First Amendment rights, and noting that the inmate retained, "at a minimum, the alternative of regular mail as a means of exercising his right to communicate with those outside the prison").

Against this backdrop, the defendants have clearly met their burden of showing that the law was not so clearly established that a reasonable prison official would have known that

denying access to semi-nude commercial images by email would violate the First Amendment. Accordingly, the defendants are entitled to qualified immunity with respect to this claim.

### 2.    The Mailed Images from FYEO

The court also concludes that the defendants have met their burden of establishing that Hoglan did not have a clearly established right to possess the three images from FYEO that were sent by regular mail. As noted above, mailroom staff initially denied access to the images on the basis that they contained "explicit or graphic depictions or descriptions of sexual acts," in violation of OP 803.1. Pl.'s Trial Ex. 3. Several months later, Hoglan was permitted to receive the same images by mail.

At trial, Hoglan argued that the images do not depict the performance of intercourse or other sexual acts described in the policy, that mailroom staff misinterpreted the relevant provisions, and that the incorrect interpretations "resulted in the wrongful disapproval of those photographs" when he initially ordered them. Jan. 29, 2020 Trial Tr. at 165. As other courts have explained, however, the failure to properly interpret or follow prison policies applicable to sexually explicit materials "does not, in itself, amount to a constitutional violation." Stroble v. Livingston, 538 F. App'x 479, 480 (5th Cir. 2013) (citing Samford v. Dretke, 562 F.3d 674, 681 (5th Cir. 2009)). Likewise, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some . . . administrative provision." Davis v. Scherer, 468 U.S. 183, 194 (1984). Consequently, "allegations about the breach of a . . . regulation are simply irrelevant to the question of an

official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right."[6] Gagne v. City of Galveston, 805 F.2d 558, 560 (5th Cir. 1986).

Moreover, as a district judge in the Eastern District of Virginia observed less than two years before Hoglan was initially denied access to the images at issue, there is "an absence of case law establishing clear lines between sexually oriented materials that can be constitutionally restricted from a jail or prison and those that cannot. Prison Legal News v. Stolle, No. 2:13-cv-00424, 2014 U.S. Dist. LEXIS 170252, at *48 (E.D. Va. Dec. 8, 2014). For that reason, courts have repeatedly ruled that inmates did not have a clearly established First Amendment right to possess images similar to those mailed to Hoglan. See, e.g., Bardo v. Clendenin, 474 F. App'x 673, 674 (9th Cir. 2012) ("The district court properly held that defendant prison officials were entitled to qualified immunity because Bardo did not have a clearly established right to retain the ad depicting side-view nudity."); Griffin v. Gorman, No. 1:17-cv-03019, 2021 U.S. Dist. LEXIS 51993, at *13–16 (D. Colo. Mar. 19, 2021) (concluding that prison officials did not have fair warning that confiscating "non-explicit photos of women in panties and swimsuits" would violate the First Amendment); Maday v. Dooley, No. 4:17-cv-04168, 2019 U.S. Dist. LEXIS 167951, at *54 (D.S.D. Sept. 30, 2019) (finding that "the law regarding what may constitute 'nudity' or 'sexually-explicit' material was not so clearly established that it would have put defendants on notice that [denying access to images of exposed breasts or buttocks] was unconstitutional"); Rapp v. Barboza, No. 9:13-cv-0599, 2016 U.S. Dist. LEXIS

---

[6] The court also notes that the Supreme Court has recognized that "what may appear to be inconsistent results [in applying a policy] are not necessarily signs of arbitrariness or irrationality" and that "greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications." Thornburgh v. Abbott, 490 U.S. 401, 417 n.15 (1989).

94557, at *25, 31 (N.D.N.Y. July 19, 2016) (concluding in the alternative that the defendants would be entitled to qualified immunity for denying access to "magazines such as the Sports Illustrated Swimsuit Edition, Playboy, Maxim, American Curves, and XXL"); Stolle, 2014 U.S. Dist. LEXIS 170252, at *45–48 (concluding that the defendants had carried their burden of establishing the absence of law that would have put them on notice that denying access to images of women in skimpy swimsuits and lingerie would be unconstitutional).

Consistent with the foregoing cases, the court concludes that the initial decision to deny access to the images mailed from FYEO did not violate clearly established law. Accordingly, the defendants also are entitled to qualified immunity with respect to this claim.

### C.      Hoglan's Objections

Hoglan filed three specific objections to the magistrate judge's R&R. In his first two objections, Hoglan argues that the magistrate judge improperly disallowed testimony that would have supported his request for punitive damages. See Pl.'s Objs., ECF No. 219-1, at 2 –4. In his third objection, Hoglan contends that the magistrate judge erred in failing to address his request for costs. Id. at 5.

The court's conclusion that the defendants are entitled to qualified immunity "bars all of [the] claims for monetary relief, including punitive damages." Rountree v. Clarke, No. 7:11-cv-00572, 2015 U.S. Dist. LEXIS 38165, at *7 n.2 (citing Young v. Lynch, 846 F.2d 960, 962 (4th 1988)); see also Olivier v. Baca, 913 F.3d 852, 861 (9th Cir. 2019) ("Olivier's claim for punitive damages against Baca individually is moot in light of our holding that Baca is entitled to qualified immunity."). Accordingly, Hoglan's objections are overruled as moot.

## VI.   Conclusion

For the reasons stated, the court sustains certain objections filed by the defendants, overrules Hoglan's objections, declines to adopt the magistrate judge's R&R, and concludes that the defendants are entitled to judgment on the remaining claims. Therefore, the court will enter judgment in favor of the defendants.

An appropriate order will be entered.

Entered:   September 30, 2022

Digitally signed by Michael F.
Urbanski      Chief U.S.
District Judge
Date: 2022.09.30 12:10:20
-04'00'

Michael F. Urbanski
Chief United States District Judge